## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **MARY HAZELTON,** derivatively on behalf of Nominal Defendant Hampshire Group, Limited )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br><br>**LUDWIG KUTTNER, JOEL GOLDBERG, MICHAEL C. JACKSON, HARVEY L. SPERRY, ROGER CLARK and IRWIN W. WINTER,** )<br><br>**Defendants,** )<br><br>**and** )<br><br>**HAMPSHIRE GROUP, LIMITED** )<br><br>**Nominal Defendant** ) | **CASE NO.** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff for the benefit of Nominal Defendant Hampshire Group, Limited ("Hampshire" or the "Company") against Defendants Ludwig Kuttner ("Kuttner"), Joel Goldberg ("Goldberg"), Michael C. Jackson ("Jackson"), Harvey L. Sperry ( "Sperry"), Roger Clark ("Clark") and Irwin W. Winter ("Winter") for breaches of their fiduciary duties owed to Hampshire during the period

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

from January 1, 2003   through the present (the "Relevant Period").[1]

## VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

3.      Venue is proper in this Court because Nominal Defendant is located within this district.  Further, one or more Defendant has received substantial compensation in this district by engaging in numerous activities and conducting business in this district.

## PARTIES

4.      Plaintiff, Mary Hazelton, as set forth in the Verification, is and was during the Relevant Period through the present, a shareholder of Hampshire.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation.  Plaintiff is a citizen of the State of Minnesota.

5.      Nominal Defendant Hampshire Group, Limited is a holding company that markets apparel for men and women   through   four   wholly-owned   subsidiaries: Hampshire  Designers,  Inc., Item-Eyes, Inc., SB Corporation and Shane Hunter, Inc. Hampshire Designers, which primarily designs and sells women's and men's sweaters, is the largest designer and marketer of sweaters in North America.  Item-Eyes,  which designs and sells a broad line of women's woven and knit related separates, is a

---

[1]  Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred on or about January 2003 to June 22, 2006 the Relevant Period continues through this day instead of ceasing on June 22, 2006, the day before the public became aware of the wrongdoing of Defendants.

2

leading designer and marketer of related separates.  David Brooks®, which the Company acquired in October 2005, designs and markets a broad range of women's sportswear for the `better' market and is designated as the Hampshire Better Brands Division.  Shane Hunter,  which the Company acquired in January 2006,  designs and markets  apparel in  children,  juniors,  missy,  petite and maternity sizes to mass merchant  retailers. Hampshire's  products,  both  branded  and  private  label,   are marketed in the moderate and better markets through multiple channels of distribution including national and regional  department stores,  mass market retailers and specialty stores. Keynote Services, Limited, the Company's Hong  Kong  based  subsidiary, assists with the sourcing and quality  control needs of Hampshire  Designers and Item-Eyes.

6.    Hampshire  is  a  corporation  organized  under  the  laws  of  the  State  of Delaware  and  is  headquartered  in  Anderson,  South  Carolina.   The  address  of  its Principal Executive Office is 1924 Pearman Dairy Rd., Anderson, SC 29625.

7.    The Company's Board of Directors currently consists of five members (5) members.  Collectively, the Board owns approximately 40% of the Company's common stock.

8.    Defendant Ludwig Kuttner ("Kuttner") is a citizen of the State of Virginia. Kuttner, at all relevant times, served as Chairman and as a member of the Board of Directors.   Kuttner  also  served  as  President  and  Chief  Executive  Officer  of  the Company from 1979 to 1992 and from 1994 through the present.  As of June 22, 2006, Defendant Kuttner was placed on administrative leave pending an investigation of the Company's Audit Committee.  Kuttner owns approximately 33.25% of the Company's

stock.

9.      Defendant Joel Goldberg ("Goldberg") is a citizen of the State of New Jersey.  Goldberg, at all relevant times, was a member of the Company's Audit, Compensation and Nominating Committee.

10.      Defendant Michael C. Jackson ("Jackson") is a citizen of the State of South Carolina.  Jackson, at all relevant times, served as a member of the Board of Directors.

11.      Defendant Harvey L. Sperry ("Sperry") is a citizen of the State of New York. Sperry, at all relevant times, served on the Company's Audit, Compensation and Nominating Committee and is a member of the Company's Board of Directors.

12.      Defendant Roger Clark is a citizen of the State of South Carolina and has served as the Company's Vice President of Finance and Chief Accounting Officer since 1999.  As of June 22, 2006, the Company placed Defendant Clark on administrative leave pending the outcome of the investigation related to the misuse and misappropriation of assets for personal benefit, certain related party transactions, tax reporting, internal control deficiencies and financial reporting and accounting for expense reimbursements.

13.      Defendant Irwin W. Winter, ("Winter") is a citizen of the State of South Carolina.  Winter, at all relevant times, served as the Chairman of the Company's Audit Committee.  Winter also served on the Company's Compensation and Nominating Committee and is a member of the Company's Board of Directors.

14.      Defendants Kuttner, Goldberg, Jackson, Sperry, Clark and Winter are collectively referred to hereinafter as the "Individual Defendants."  The Individual

Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Hampshire's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

15.    The Individual Defendants, as senior officers and/or directors of Hampshire, were controlling persons of the Company. Each exercised their power and influence to cause Hampshire to engage in the fraudulent practices complained of herein.

16.    Each of the Defendants are liable as a participant in a fraudulent scheme and course of business by disseminating materially false and misleading statements and/or concealing material adverse facts.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

17.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

18.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained herein.

19.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies and practices and controls of the Company.   By virtue of such duties the Individual Defendants were required to, *inter alia*:

a.    Exercise good faith to ensure that the Company was operated in an diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

b.    Exercise good faith in taking action to correct any misconduct and prevent its recurrence when placed on notice of improper or imprudent conduct by the Company and/or its employees.

20.    The Individual Defendants, particularly the Officers and members of the Board of Directors' Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the

Company's financial statements were based on accurate financial information. Further, the Audit Committee was responsible in evaluating the independence and performance of making recommendations to the Board with respect to the appointment of the Company's independent accountants, evaluating the independence and performance of such accountants, reviewing the scope of the annual audit, and reviewing and discussing with management and the independent accountants the audited financial statements and accounting principles.

21.    Hampshire's Compensation Committee is responsible for reviewing the compensation of the executive officers of the Company and its subsidiaries, recommending to the Board the salaries and any bonus or cash incentive plans for such executive officers, and administering the Company's long-term incentive compensation plans.

## SUBSTANTIVE ALLEGATIONS

22.    The Defendant directors face a substantial likelihood of liability in this action because of false and misleading statements issued by the Company concerning the Company's business practices, related transactions, internal controls, and omitted material information regarding Hampshire' falsified financial results. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight. These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

of losses for the Company as the Company's common stock traded at artificially inflated levels.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

23.      On or about October 8, 2003, the Company announced its plan regarding the acquisition and disposition of certain Company's assets.  The Company issued a press release that stated in relevant part:

> On October 8, 2003, Hampshire Investments, Limited ("HIL"), a subsidiary of Hampshire, Group, Limited ("HGL"), sold certain assets to K Holdings, L. L. C., a company controlled by Ludwig Kuttner, Chairman and Chief Executive Officer of HGL, for a purchase price of 250,000 shares of HGL common stock. Immediately after this sale, HGL sold all of the outstanding shares of capital stock of HIL to an investor group including Mr. Kuttner, Peter Woodworth, a Director of HGL, and Charles Clayton, Treasurer of HGL, for a purchase price of 450,000 shares of HGL. The assumed fair market value of the HGL common stock received in the two transactions was $23,905,000 using a price of $34.15 per share, as reported by NASDAQ at the market close of October 7, 2003, the trading day prior to the date on which the transactions were consummated.
>
> The transactions referred to above were negotiated on behalf of the Company by a Special Committee of the Board of Directors of HGL which had been formed to consider a possible sale of HIL and approved by Board of Directors. The Special Committee retained independent counsel and Shattuck Hammond Partners L.L.C. as its independent financial advisor ("Shattuck Hammond"). Shattuck Hammond rendered an opinion to the Special Committee that the consideration for the assets and the HIL stock was fair to HGL, from a financial point of view.

24.      On news of this announcement, Hampshire stock declined from $34.15 to $33.77 per share, a decrease of $.38 a share, or 1.2 %.

25.      On November 6, 2003, Hampshire issued its financial results for the quarter ended September 27, 2003.  The Company's press release stated in relevant part:

8

HAMPSHIRE GROUP, LIMITED ANNOUNCES THIRD QUARTER RESULTS

Anderson, SC, November 6, 2003...Hampshire Group, Limited (Nasdaq: HAMP) today announced results for the quarter ended September 27, 2003. Net sales were $97,036,000 compared with $109,134,000 for the same period last year. The Company had net income from continuing operations of $4,865,000 or $1.00 per fully diluted share, compared with net income from continuing operations of $8,823,000 or $1.82 per fully diluted share in the same period in 2002.

For the nine months ended September 27, 2003, net sales were $180,164,000 compared with $183,529,000 for the same period last year. Net income from continuing operations was $4,628,000 or $0.95 per fully diluted share, compared with net income from continuing operations of $9,453,000 or $1.96 per fully diluted share in the same period in 2002.

Ludwig Kuttner, Chairman and Chief Executive Officer, stated: "Sales were lower than expected because of a highly competitive retail market. Gross margins continue to be negatively impacted by higher allowances granted to customers. We are encouraged by strong fourth quarter bookings in women's sweaters offsetting weakness in related separates and men's sweaters, but we remain cautious with respect to year-end results because of the retail market environment. Our team continues to focus on quality and service to our customers."

As previously announced, the Company sold Hampshire Investments, Limited ("HIL"), a subsidiary of Hampshire Group, on October 8, 2003. A loss of $5,901,000 from the sale was included in the discontinued operations. As a result of the sale, Hampshire Group acquired 700,000 shares of its common stock and debt was reduced by $11,830,000. The divestment of HIL will allow the Company to focus solely on its apparel business.

The Company had a net loss of $865,000 or $0.18 per fully diluted share for the quarter ended September 27, 2003, compared with net income of $9,033,000 or $1.86 per fully diluted share in the same period in 2002 and a net loss of $715,000 or $0.15 per fully diluted share for the nine months ended September 27, 2003, compared with net income of $9,606,000 or $1.99 per fully diluted share in the same period in 2002.

26.    On or about November 23, 2003, the Company issued a press release announcing the resignation of its Chief Financial Officer.  The press release stated in relevant part:

HAMPSHIRE GROUP, LIMITED CFO RESIGNS

Anderson, SC, November 21, 2003...Hampshire Group, Limited (NASDAQ: HAMP) today announced its Chief Financial Officer, William W. Hodge, has expressed his intent to leave the company to pursue other business opportunities. The company named Charles W. Clayton, Treasurer of the company, to assume the responsibilities of CFO.

"I want to thank Bill for his dedication and service throughout his tenure here at Hampshire." said Ludwig Kuttner, Chairman and Chief Executive Officer of Hampshire Group, Limited. "We wish Bill the best as he moves on to his next challenge."

 Mr. Kuttner added that the company is fortunate that Charles Clayton, Hampshire's former CFO, will step in and fill the role of CFO until a permanent successor is named.

27.    On or about March 8, 2003, the Company announced its 2003 and fourth quarter results.  The press release stated in relevant part:

Hampshire Group Announces 2003 Year and Fourth Quarter Results

ANDERSON, S.C., March 4, 2004...Hampshire Group, Limited announced today that net income from continuing operations for the year ended December 31, 2003 was $11,423,000, or $2.43 per diluted share compared with $18,541,000, or $3.84 per diluted share in 2002.  Net sales were $292,651,000 in 2003, compared with $293,268,000 reported for the prior year.

Hampshire Group, Limited sold its investment subsidiary,  Hampshire Investments, Limited, on October 8, 2003, after the Board of  Directors determined  that shareholder  value  would be  enhanced  by concentrating  solely on the apparel business.  Results of the investment business are  reported as a  discontinued  operation in the Company's financial statements.  In 2003, net income, including $637,000 income of the discontinued operation and after a loss of $6,433,000 on the sale of the discontinued operation, was $5,627,000, or $1.20 per diluted share.

These results compare with net income of $17,048,000, or $3.53 per diluted share in 2002.

In the fourth quarter of 2003, net sales were $112,487,000 compared with $109,739,000 in the prior year, and net income from continuing operations was $6,795,000, or $1.60 per diluted share compared with $9,088,000, or $1.88 per diluted share for the fourth quarter 2002.

The Company said that results in 2003 were affected by the highly competitive conditions that continue to prevail in the retail apparel market. In the women's sweater business, both sales and earnings increased despite strong competition, but reduced gross margins in men's sweaters and women's related separates resulted in a decline in earnings. The Company said it expects margins to continue to be under pressure through 2004.

Commenting on results, Ludwig Kuttner, Chairman and Chief Executive Officer of Hampshire Group said, "It should be noted that although the financial results for 2003 were less than those for 2002, the 2003 results have only been exceeded by the Company in two other fiscal years. In 2003, we continued to invest in our future by strengthening our supplier network and by continuing our efforts to exceed the expectations of our customers for quality, service and value."

28.     As the Company continued to release its financial results, the company continued to deceive investors by stating that its financial conditions exceeded expectations. The Company's financial results as published within its 10-Q were released in a press release dated May 7, 2003. The press release reported the Company's financial condition as follows:

HAMPSHIRE GROUP, LIMITED ANNOUNCES FIRST QUARTER RESULTS

Anderson, SC, May 7, 2003...Hampshire Group, Limited (Nasdaq: HAMP) today announced results for the three month period ended March 29, 2003. Net sales for the three months were $51,167,000 compared with $42,859,000 for the same period last year, an increase of $8,308,000 or 19 percent. Net income was $1,102,000 or $0.23 per fully diluted share, compared with $1,096,000 or $0.23 per fully diluted share in the first quarter last year.

Management reported that net sales exceeded expectations. However, gross margins were lower because of a difficult retail market and additional cost associated with the replacement of a major supplier.

Ludwig Kuttner, Chairman and Chief Executive Officer, stated, "We are pleased with the start of the year. Customer orders remain strong, which we believe will have a favorable impact on the third and fourth quarters. We will continue to manage our business conservatively in this retail environment."

29.    For the quarterly period ended June 28, 2003, the Company released the following financial report:

Anderson, SC, August 8, 2003...Hampshire Group, Limited (Nasdaq: HAMP) today announced results for the quarter ended June 28, 2003. Net sales were $31,961,000 compared with $31,536,000 for the same period last year. The Company had a net loss of $952,000 or $0.20 per fully diluted share, compared with a net loss of $523,000 or $0.11 per fully diluted share in the same period in 2002.

For the six months ended June 28, 2003, net sales were $83,128,000 compared with $74,395,000 for the same period last year. Net income was $150,000 or $0.03 per fully diluted share, compared with a net income of $573,000 or $0.12 per fully diluted share in the same period in 2002.

Although the Company's sales were in line with expectations, gross margin was negatively impacted by higher allowances granted to customers as a result of a difficult and highly promotional retail market.

Ludwig Kuttner, Chairman and Chief Executive Officer, stated "We are entering what has consistently been the strongest part of our year with a healthy open order position. While we remain encouraged about the balance of the year, we are sensitive to the uncertain economic climate and difficult retail environment and the impact they could have on our results. We continue to stay focused on long-term goals and on maintaining our excellent relationships with our retail partners."

30.    On or about May 6, 2004, the Company issued it financial results.  The results in part were as follows:

HAMPSHIRE GROUP, LIMITED ANNOUNCES FIRST QUARTER RESULTS

12

Anderson, SC, May 6, 2004...Hampshire Group, Limited (NASDAQ: HAMP) today announced results for the three month period ended April 3, 2004. Net sales for the three months were $54,397,000 compared with $51,167,000 for the same period last year, an increase of 6.3%. Income from continuing operations was $147,000 or $0.03 per diluted share, compared with $711,000, or $0.15 per diluted share in the first quarter of 2003. Net income for the quarter was $147,000, or $0.03 per diluted share, compared with $1,102,000, or $0.23 per diluted share in the prior year.

Management reported that the increase in sales for the quarter, compared with the prior year, was primarily a result of higher shipments of sweaters by Designers Originals and related separates of Item-Eyes. Lower gross margins resulted from continuation of difficult conditions in a highly competitive retail marketplace and establishing a $1.2 million reserve for estimated incremental customs costs related to importing merchandise from one of its vendors.

Ludwig Kuttner, Chairman and Chief Executive Officer, stated, "In addition to market conditions, the Company is coping with uncertainty caused by the expiration of the quota agreement at the end of 2004 and foreign currency fluctuations relative to the dollar. The Company will continue to focus on product quality and providing service and value to its customers."

31.    The Company issued its financial results announcing a decline in its

net sales.  The press release dated August 6, 2004 stated in relevant part:

HAMPSHIRE GROUP, LIMITED ANNOUNCES FIRST HALF RESULTS

Anderson, South Carolina, August 6, 2004...Hampshire Group, Limited today announced results for the second quarter and first half of 2004. Net sales for the quarter ended July 3, 2004 were $26,252,000 compared with $31,961,000 for the quarter ended June 28, 2003, a decrease of 17.9%. The net loss in the second quarter of 2004 was $1,694,000, or $0.42 per diluted share, compared with a net loss of $952,000, or $0.20 per diluted share in the second quarter of 2003.

Net sales for the six months ended July 3, 2004 were $80,649,000 compared with $83,128,000 in the six months ended June 28, 2003, a decline of 3.0%. The loss in the first half of 2004 from continuing operations was $1,547,000, or $0.38 per diluted share, compared with a loss of $237,000, or $0.05 per diluted share, in the first half of 2003. Net loss for the first half of 2004 was $1,547,000, or $0.38 per diluted share,

13

compared with net income of $150,000, or $0.03 per diluted share in 2003.

Due to the seasonality of the sweater business, it is typical for Hampshire Group, Limited to report losses in the first half of the year with the majority of its sales occurring in the second half of the year.

In the first half of 2004, sales were strong for the Company's core brand product line, Designers Originals® sweaters for women; accordingly, the results for this line improved in comparison with 2003. This improvement was offset by the performance of the balance of the Company's other product lines.  Business remained highly competitive across all product lines. The results for the second quarter were positively affected by the reduction of $785,000 of a $1,200,000 reserve established in the first quarter of 2004 for estimated incremental customs costs related to importing merchandise from one of the Company's vendors.

Ludwig Kuttner, Chairman and Chief Executive Officer, stated, "We continue to remain focused on style, quality and value for the consumer and outstanding service for the retailer. In this competitive environment, we believe we will reap long-term benefits for our Company and our shareholders by adhering to the basic business principles that have contributed to our success and the success of our customers over the years."

32.    The Company issued its financial results as follows for its third quarter:

HAMPSHIRE GROUP, LIMITED ANNOUNCES THIRD QUARTER RESULTS

Anderson, South Carolina, November 4, 2004...Hampshire Group, Limited today announced results for the third quarter and the nine months ended October 2, 2004. Net sales for the quarter ended October 2, 2004 were $116,104,000 compared with $97,036,000 for the quarter ended September 27, 2003, an increase of 20%.  Net income in the third quarter of 2004 was $6,940,000, or $1.69 per diluted share, compared with income from continuing operations of $4,865,000, or $1.00 per diluted share in the third quarter of 2003.

Net sales for the nine months ended October 2, 2004 were $196,753,000 compared with $180,164,000 in the nine months ended September 27, 2003, an increase of 9%. Net income in the nine-month period of 2004 was $5,393,000, or $1.31 per diluted share, compared with income from continuing operations of $4,628,000, or $0.95 per diluted share, in the nine-month period of 2003. Net loss for the nine months ended September

14

27, 2003, was $715,000, or $0.18 per share, including a $5,343,000 loss from discontinued operations.

In the third quarter, sales of both sweaters and related separates continued to reflect the Company's success in offering customers the value, style and quality that retail consumers are seeking in today's market. The quarter and nine-month period for the current year each included one more week than the prior year, contributing substantially to the increases in net sales and profits. Sales and profitability for the fourth quarter will be adversely affected by the loss of a week in the fourth quarter compared with the fourth quarter of 2003.

Commenting on results for the year-to-date, Ludwig Kuttner, Chairman and Chief Executive Officer, stated, "We are pleased to be reporting favorable period-to-period comparisons of net sales, net income and net income per share in spite of the difficult retail environment. Our people are working diligently to service our customers' needs during the important holiday selling season."

33.    The Company then issued its financial results as follows for first quarter

2005:

HAMPSHIRE GROUP, LIMITED ANNOUNCES FIRST QUARTER RESULTS

Anderson, South Carolina, May 9, 2005....Hampshire Group, Limited today announced results for the first quarter ended April 2, 2005. Net sales were $58,077,000 compared with $54,397,000 for the same period in the prior year, an increase of 7%. Net income from operations was $748,000, or $0.18 per diluted share, compared with $147,000, or $0.03 per diluted share in the first quarter of 2004.

The increases in sales and net income in the quarter are primarily attributable to the related separates business. In addition, the net income comparison was affected by $1.2 million charge ($720,000 after taxes) for incremental custom's charges for the first quarter of 2004. Because of the seasonality of the sweater business, which accounts for well over half of the Company's annual sales, results in the first quarter are not indicative of results for the full year.

Commenting on the first quarter, Ludwig Kuttner, Chairman and Chief Executive Officer, stated, "We are pleased to have been able to increase sales in what has continued to be an extremely difficult retail environment. As we have reported many times, our outstanding team has a consistent

focus on offering attractive merchandise to consumers while supporting retailers with quality products that provide good margins."

34.    The Company again issued its financial results for 2005:

HAMPSHIRE GROUP, LIMITED ANNOUNCES SECOND QUARTER RESULTS

Anderson, South Carolina, August 4, 2005....Hampshire Group, Limited today announced results for the second quarter and six months ended July 2, 2005. Net sales during the quarter were $38,636,000 compared with $26,252,000 for the same period during the prior year, and net income was $984,000, or $0.12 per diluted share, compared with a net loss of $1,694,000, or $0.21 per diluted share in the second quarter of 2004. The income during the second quarter of 2005 included non-recurring income of $2,755,000 ($4,622,000 less provision for taxes of $1,867,000) relating to a settlement with two former employees of claims by the Company arising in respect to improper payments by a former vendor of the Company to the former employees. The non-recurring income, after provision for income taxes, contributed $0.33 to net income per diluted share during the second quarter of 2005.

During the first six months of 2005, net sales were $96,713,000 compared with $80,649,000 for the same during the prior year, and the net income was $1,732,000 or $0.21 per diluted share compared with a net loss of $1,547,000 or $0.19 per fully diluted share during the first six months of 2004. The non-recurring income, after provision for income taxes, contributed $0.33 to net income per diluted share in the six months ended July 2, 2005.

Continuing the trend of the first quarter, the improved sales are primarily attributable to the related separates business. Because of the seasonality of the sweater business, which accounts for well over sixty percent of the Company's annual sales, results in the first half are not indicative of results for the full year.

Commenting on the results, Ludwig Kuttner, Chairman and Chief Executive Officer, stated, "The sweater business continues to be highly competitive and very difficult. We are pleased to have the increased performance provided by our related separates business, which has helped us report good comparative results for the first six months. We are expecting continued challenges during the balance of the year, particularly in women's sweaters."

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

35.    The Company then issued the following press release announcing its

earnings:

HAMPSHIRE GROUP, LIMITED ANNOUNCES THIRD QUARTER
RESULTS

Anderson, South Carolina, November 3, 2005....Hampshire Group,
Limited today announced results for the third quarter and nine months
ended October 1, 2005.  Net sales during the quarter were $123,592,000
compared with $116,104,000 for the same period during the prior year, an
increase of 6.5%. For the current quarter, net income was $6,927,000, or
$0.85 per diluted share, compared with net income of $6,940,000, or
$0.84 per diluted share during the third quarter of 2004.

During the first nine months of 2005, net sales were $220,305,000
compared with $196,753,000 for the same period during the prior year, or
a 12% increase. Net income for the first nine months of 2005 was
$8,659,000, or $1.05 per diluted share, compared with net income of
$5,393,000, or $0.65 per diluted share, during the first nine months of
2004. The nine-month period of 2005 includes net non-recurring income of
$2,755,000 relating to a settlement with two former employees of claims
by the Company arising in respect to improper payments by a former
vendor of the Company to the former employees. The non-recurring
income, after provision for income taxes, contributed $0.34 to net income
per diluted share during the nine-month period.

In the third quarter, sales of related separates were strong, reflecting
increased sales of private label products to supplement the
Requirements® brand. Men's sweaters had a strong quarter in
comparison with the prior year.  Sales of women's sweaters were reduced,
but expenses were also reduced.

Just after the close of the third quarter, the Company acquired the David
Brooks® trade mark and inventory from Kellwood Company, and the
David Brooks staff joined Hampshire Group in a newly established division
called Hampshire Better Brands. The Company intends to build a niche
position in the better women's sweater and related separates business
using David Brooks, a well-established trade mark in the specialty store
market. Net sales for the business for 2006 are projected to be in the $12
million range.

Commenting on the third quarter and nine month results, Ludwig Kuttner,
Chairman and Chief Executive Officer, stated, "As we have been reporting
for a number of quarters, selling to the retailing industry is highly
competitive and demands the continued efforts of our team on design,

17

value and service. We are pleased to be reporting gains in sales and earnings despite this difficult environment."

36.    The Company continued to tout its strong earnings and released the following press release regarding the acquisition of the assets of Shane-Hunter:

HAMPSHIRE EXECUTES ON EXPANSION STRATEGY INTO "MASS MERCHANT RETAIL" MARKET THROUGH ACQUISITION OF ASSETS FROM SHANE-HUNTER

Anderson, SC, January 5, 2006...Hampshire Group, Limited announced today that it has acquired substantially all of the assets of Shane-Hunter, Inc. from its founders.  Shane-Hunter, which is, and will continue to be, based in San Francisco, California, is predominantly engaged in the sale of juniors' apparel to mass merchant retailers.  The principals of Shane-Hunter, Wayne Malen and Michael Thaler, will continue with the business as its co-Presidents, and their design, sales, production and support team will be remaining with the business and will continue to run its day-to-day operations.

Shane-Hunter was founded in 1988.  Since that time, it has established a reputation for providing   well-designed   fashion at an affordable price.  Shane-Hunter designs,  sources and sells apparel in children's,  juniors, missy, petites and maternity  sizes to mass merchant  retailers,  including Target and Mervyn's,  under  its own  Aqua-Blues(R)  label,  as well as the labels  of its customers.

Wayne Malen remarked that "All of us at Shane-Hunter are extremely excited about the opportunities now available to us through the financial support and sourcing network of Hampshire.  We believe our business has real growth potential and we now have the ability to aggressively go after those opportunities." Mike Thaler added that, "Hampshire's reputation as a company that will not compromise on its philosophy of exceeding its customers' expectations for quality, value and service will help to open even more doors for us."

Commenting on the acquisition, Ludwig Kuttner, Hampshire's  Chairman and Chief Executive  Officer,  stated,  "We intend to be  wherever  our consumer  shops.  Shane-Hunter's longstanding reputation of providing fashion right product at a great value to discerning customers represents a significant opportunity for Hampshire to enhance its existing mass-market distribution channels.  As the market share of mass-market retailers has grown  significantly in recent years, they  have  come  to  represent  a market  opportunity  deserving  of  increased attention.  In keeping with our diversification and expansion strategy, we are pleased to expand our

product line into the juniors' market on a significant scale, which we believe will provide Hampshire with extended customer reach and sourcing efficiencies."

37.    On or about March 2, 2006, the Company issued its financial

results for 2005 as follows:

Hampshire Group Announces Results for 2005 Year and Fourth Quarter

ANDERSON, S.C., March 2, 2006...Hampshire Group, Limited (NASDAQ Symbol: "HAMP") today announced that net income for the year ended December 31, 2005, was $12,798,000, or $1.56 per diluted share compared with $13,725,000, or $1.66 per diluted share, in 2004. Net income in 2005 included non-recurring income of $2,755,000, net of income taxes. Net sales for the year ended December 31, 2005 were $324,025,000 compared with net sales of $301,999,000 for 2004.

In the fourth quarter of 2005 net sales were $103,720,000 compared with $105,246,000 in the prior year, and net income was $4,139,000, or $0.51 per diluted share, compared with $8,332,000, or $1.01 per diluted share for the fourth quarter 2004.

The Company reported that income was strong in the men's sweater business, asits branded strategy helped to achieve market share gains in a declining market. The women's sweater business and the related separates businesses were adversely affected by competitive market conditions.

Commenting on results, Ludwig Kuttner, Chairman and Chief Executive Officer of Hampshire Group, said, "Market conditions continue to be difficult, in part because of the continuing consolidation and change in the retailing industry. Our strategy is to continue to differentiate our Company through our emphasis on uncompromising quality, value, style and service and to strengthen and develop our brands as a means of further differentiation."

Further, he said, "We continue our efforts to expand our market penetration with two acquisitions. The David Brooks business is now part of our newly established division `Hampshire Better Brands' with which we intend to build a niche position in the better women's sweater and related separates market. The January 2006 acquisition of Shane Hunter, Inc. represents an opportunity to enhance our existing mass-merchant distribution."

38.    The Company issued its financial statements announcing an increase in

19

its net sales.  The Company attributed this increase to the acquisition of David Brook

and Shane Hunter.  The press release stated in relevant part:

> HAMPSHIRE GROUP, LIMITED ANNOUNCES FIRST QUARTER RESULTS
>
> Anderson,    South Carolina, May 4, 2006....Hampshire Group, Limited today announced results for the first quarter ended April 1, 2006.  Net sales were $68,111,000 compared with $58,077,000 for the same period in the prior year, an increase of 17%. Net loss was $176,000, or $0.02 per diluted share, compared with net income of $748,000, or $0.09 per diluted share, in the first quarter of 2005.
>
> The  first quarter of 2006 included net sales of $19,181,000,  which  were attributable  to the  operations  of David  Brooks and Shane  Hunter,  that were acquired in October  2005 and  January  2006,  respectively. Sales in the first quarter 2006 are not indicative of sales for the full year because of the seasonality of the sweater business.
>
> Ludwig Kuttner, Chairman and Chief Executive Officer, stated,   "Our recent acquisitions of David Brooks is enabling us to expand into the better market for women's apparel and Shane Hunter is expanding our presence in the mass merchant segment of retailing. At the same time, we are focusing on brand building in all of our businesses, so we can further differentiate our products in the very competitive retail market.  However, the retail market continues to be very challenging."
>
> Hampshire Group also announced that its Board of Directors approved the repurchase of up to 1,000,000 shares of the Company's outstanding common stock.  The repurchase will be conducted through open market or privately negotiated transactions over an indefinite period.

39.    On or about May 18, 2006, the Company announced its agreement to

acquire Marisa Christina.  The Company's press release  stated in relevant part:

> HAMPSHIRE ENTERS INTO DEFINITIVE AGREEMENT TO ACQUIRE MARISA CHRISTINA
>
> Anderson, SC, May 18, 2006...Hampshire Group, Limited announced today that it has entered into a definitive agreement pursuant to which a   wholly-owned subsidiary will merge with and into Marisa Christina, Incorporated, after which time Marisa  Christina will continue to operate as a wholly-owned  subsidiary of Hampshire Group. Upon completion of the merger, each outstanding share of Marisa Christina  common  stock will

be converted into the right to receive $0.65 per share less a pro rata portion of the transaction costs incurred by Marisa Christina, representing an aggregate purchase price of approximately $4.8 million. Marisa Christina's Board of Directors has agreed to support the merger and has recommended its approval by Marisa Christina's stockholders. The closing conditions, including receipt of stockholder approval from Marisa Christina's stockholders, are expected to be satisfied in the very near future and the acquisition is expected to be consummated within the next week.

Marisa Christina was founded in 1971 and quickly became known as an innovator in the area of knit dressing. Today, Marisa Christina has evolved into a more complete and modern lifestyle collection of apparel that celebrates the beauty and personal spirit of today's woman while still offering the same design flare, attention to detail and quality workmanship for which it has always been know. Marisa Christina is sold through over 700 specialty stores, as well as upscale department stores.

Ludwig Kuttner, Hampshire's Chairman and Chief Executive Officer, remarked, "We are looking forward to the expansion of our women's better market strategy through the acquisition of Marisa Christina. Marisa Christina has a longstanding reputation of providing trend-driven garments that tastefully incorporate beautiful fabrics, rich colors, seasonal motifs and unique design details in a clean, comfortable fit. In keeping with our diversification and expansion strategy, we feel that Marisa Christina will help to add scale to our women's better market business."

40.    On news of this announcement, Hampshire stock increased from $19.18 to $19.58 per share, an increase of $.40 or over 2%.

41.    Approximately one (1) month later, on or about June 22, 2006, after the Company announced its agreement to acquire Marisa Christina, the Company issued a press release announcing an audit committee investigation due to, *inter alia*, the Company's misuse and misappropriation of assets. The press release stated in relevant part:

HAMPSHIRE ANNOUNCES AUDIT COMMITTEE INVESTIGATION

Anderson, SC, June 22, 2006...Hampshire Group, Limited (NASDAQ: HAMP) announced today that the Audit Committee of its Board of

Directors has determined to investigate issues related to, among other things, the misuse and misappropriation of assets for personal benefit, certain related party transactions, tax reporting, internal control deficiencies and financial reporting and accounting for expense reimbursements, in each case involving certain members of Hampshire's senior management. The Audit Committee has engaged independent counsel to conduct the investigation.

Pending the outcome of the investigation, the Board of Directors has placed Ludwig Kuttner, Hampshire's Chief Executive Officer, Charles Clayton, Hampshire's Executive Vice President and Treasurer and former Chief Financial Officer, Roger Clark, Hampshire's Vice President of Finance and Principal Accounting Officer, and two personal assistants on administrative leave.

Michael Culang, President and Chief Executive Officer of Hampshire Designers, Inc., has agreed to serve as Hampshire's interim Chief Executive Officer effective immediately. In addition, Eugene Warsaw, Hampshire's former Senior Executive Vice President and Chief Marketing Officer, has agreed to assist the Board of Directors effective immediately.

"The Board of Directors and other members of senior management of Hampshire are committed to the highest level of accounting and financial reporting standards," said Michael Culang. "Our business units remain focused on providing our customers with quality products and the highest level of customer service."

Hampshire has a strong balance sheet. As previously reported, at 2005 year end Hampshire had $75 million in cash and short-term investments, $99 million in working capital, and shareholders' equity of $109 million.

42.    On news of this announcement, Hampshire stock declined from $17.00 to $15.44 per share, a drop of $2.44, or approximately 15%.

43.    On or about June 26, 2006, the Company announced the appointment of Michael Culang as the Company's interim President and Chief Executive Office pending an investigation into the Audit Committee.  The Company's  press release stated the following:

Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.

22

On June 26, 2006, the Board of Directors of Hampshire Group, Limited (the "Company") appointed Michael Culang as the Company's interim President and Chief Executive Officer effective as of June 22, 2006.

Mr. Culang has been the President and Chief Executive Officer of Hampshire Designers, Inc., a wholly owned subsidiary of the Company, since July 2005. Previously, Mr. Culang served as President and Chief Executive Officer of Hampshire Brands, the men's division of Hampshire Designers, Inc., from 2003 to 2005 and as President of the division from 1998 to 2003. Prior to joining the Company, Mr. Culang served as President of Somerset Knitting Mills, a Division of Phillips-Van Heusen, from 1986 through 1997. Mr. Culang's employment agreement with Hampshire Designers, Inc., dated as of July 1, 2005, provides for an annual salary of $600,000 and an incentive bonus based on the adjusted pre-tax income of Hampshire Designers, Inc. The employment agreement may be terminated by the Company at any time upon six month's written notice or by the Mr. Culang upon three month's written notice.

Also on June 26, 2006, the Board of Directors of the Company appointed Jonathan Norwood as the Company's interim Treasurer effective as of June 22, 2006. Mr. Norwood will also assume the role of the Company's principal accounting officer. Mr. Norwood will continue to serve as the Company's Chief Financial Officer, which position he assumed in April 2006. Previously, Mr. Norwood served as Controller and as a member of senior management of Liberty Corporation from April 2001 until its acquisition by Raycom Media, Inc. on January 31, 2006. Prior to working for the Liberty Corporation, Mr. Norwood served as Chief Financial Officer of Team Vest, LLC from January 2000 to March 2001 and Director or Finance from March 1996 to December 1999. Mr. Norwood began his accounting career with Ernst & Young, LLP in 1991 and became a certified public accountant in 1994. Mr. Norwood's employment agreement with the Company, dated February 27, 2006, provides for an annual salary of $168,000 and an incentive bonus based on the actual net sale and net income results of the Company. The Company has guaranteed $72,000 of Mr. Norwood's bonus payment for his first year of employment. The employment agreement may be terminated by the Company or Mr. Norwood at any time.

*****

44.    Defendants' press releases, as referenced above, were false and misleading. Defendants already knew or were in conscious and reckless disregard of the fact that despite this steady news of solid financial statements, the Company had

23

falsely represented the revenue opportunities they represented. Defendants' false representations of dramatic growth in revenues based on mergers and acquisitions of other companies served to conceal from the investment community the Company's inability to dramatically expand both revenues and margins, in a low-margin and highly competitive market space.

## DEMAND WOULD BE FUTILE

45.     The Defendant directors face a substantial likelihood of liability in this action because the Company issued false and misleading statements concerning the Company's business practices, internal controls, and omitted material information regarding Hampshire' falsified financial results. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight. These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company as the Company's common stock traded at artificially inflated levels.

46.     At the time of filing this lawsuit, the members of the Board are Defendants Kuttner, Goldberg, Jackson, Sperry, and Winter.

### Likelihood of Substantial Liability
### of the Audit Committee Defendants

47.     Defendant Director and Chairman Winter and Defendant Goldberg and Sperry also had enhanced responsibilities as members of the Company's Audit Committee. That Committee was charged with direct responsibility for the appointment,

24

compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.

48.    Given the size, scope, and blatancy of the financial misrepresentations described above, the Audit Committee members knew of the financial manipulations or turned a blind eye to them.  Such conduct is also not protected by the business judgment rule and exposes these Individual Defendants to a substantial threat of liability in this action.

## Additional Likelihood of Substantial Liability
## of Other Board Members

49.    Defendant Directors Jackson and Kuttner are also exposed to substantial potential liability in this action because of their complete failure to put appropriate financial and legal compliance controls in place to assure the accuracy of financial information disclosed by the company to the public.

50.    In addition, Defendant Directors Goldberg, Sperry, and Winter are members of the Company's Compensation Committee.  Defendant Winter was determined by the Board as an audit committee financial expert.  As a person of special knowledge and talents, more is expected of Winter in preventing and ferreting out fraud and inadequate financial controls.  That Committee was charged with direct responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls. In those positions, they approved compensation plans for senior executives and

25

directors, pursuant to which millions of dollars were paid out by the Company based on financial results that have now turned out to be grossly inflated.

### Each Director Defendant Lacks Independence

51.    Defendant Direct Kuttner, as the Company's current Chief Executive Officer, lacks the sufficient independence with which to render a disinterested decision on whether  to pursue the Derivative Claims against the Individual Defendants

52.    Defendant Directors Winter, Goldberg, and Sperry are members of the Board's Compensation Committee, and so, as described above, lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

53.    Plaintiff has not made any demand on the shareholders of Hampshire to institute this action since demand would be a futile and useless act for the following reasons:

    a.    Hampshire is a publicly held company with approximately 7,862,505 shares outstanding, and thousands of shareholders;

    b.    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

    c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

54.    Hampshire has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts.

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

55. Additionally, Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be a futile and useless act for the following reasons:

a. Director Defendant Kuttner is not considered an independent director of Hampshire. Defendant Kuttner is beholden to Hampshire because of his employment agreement with Hampshire. Defendant Kuttner's compensation is based on his employment agreement with the Company, which provides for an annual salary of $600,000.00 in addition to annual incentive compensation based on a bonus plan approved for senior management of the Company and annual deferred compensation of $550,000.00. The incentive bonus paid to Kuttner for 2005 reflected the achievement of the Company's established goals. Because of Kuttner's employment relationship with the Company, it is reasonable to conclude demand upon Defendant Director Kuttner is futile.

b. The Company leased two buildings from a company in which Defendant Kuttner and Charles W. Clayton, Executive Vice President of the Company, are the beneficial owners. Rent expense under such leases for the years ended December 31, 2005, 2004 and 2003 was approximately $88,000.00, $153,000.00 and $251,000.00 respectively. The Company's lease for a distribution center in Anderson, South Carolina, expired April 30, 2004, and was not renewed. The lease for the administrative offices was cancelled by mutual consent in March 2006. The terms of the leases with the related company were approved by the Board of Directors of the Company. Due to Defendant Kuttner's inter-related business transactions, demand on Defendant Kuttner is futile.

c. The Company has entered into a twelve-year lease with a company in which Defendant Kuttner is the beneficial owner. The building currently serves as administrative offices for the Company. The terms of the lease were approved by the Board of Directors. Due to the Board's inter-related business transactions, demand on Defendants Kuttner, Goldberg, Jackson, Sperry, and Winter is futile.

d. The Company entered into a $41,000.00 purchase agreement for data and communication lines and hardware for the new administrative offices with a company in which Defendant Kuttner is a 75% beneficial owner. The terms of the inter-related purchase agreement with Defendant Kuttner was approved by the Company's Board of Directors. Due to Defendant Kuttner's inter-related business transactions and the Board's approval of such transaction,

demand on Defendants Kuttner, Goldberg, Jackson, Sperry and Winter is futile.

e.    Director Defendant Sperry is a retired Partner of the law firm of Willkie Farr & Gallagher LLP, which provides legal services to the Company.   Because of Defendant Sperry's inter-related business relationships, demand on Defendant Sperry is futile.

f.    On or about December 13, 2005, the Company purchased 80,000 shares of its common stock from Defendant Kuttner as part of the Company's announced common stock repurchase plan.    The Company paid Defendant Kuttner approximately two million dollars at $24.49 per share.

g.    Prior to joining the Company's Board, Defendants Winter and Goldberg served as an officer and director, of Phillips-Van Heusen Corporation ("Phillips").  Specifically, Defendant Winter served as the Vice President and Defendant Goldberg currently serves on the Board of Directors for Phillips.  During their years of working together at Phillips, they developed both a social and professional relationship from which it is reasonable to conclude that they would not authorize suit against each other.  As such, demand on Defendants Winter and Goldberg is futile.

h.    In order to bring this suit, a majority of the Directors of Hampshire would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

i.    The acts complained of constitute violations of the fiduciary duties owed by Hampshire's officers and directors and these acts are incapable of ratification.

j.    Hampshire has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendant and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Hampshire any part of the damages Hampshire suffered and will suffer thereby.

k.    The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

l.    Any suit by the directors of Hampshire to remedy these wrongs would likely expose the Director Defendants and Hampshire to further violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

### FIRST CAUSE OF ACTION

**Against Individual Defendants
for Breach of Fiduciary Duty**

56.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

57.    The Individual Defendants owed and owe Hampshire fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Hampshire the highest obligation of good faith, fair dealing, loyalty and due care.

58.    The Individual Defendants, each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

59.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

60.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Hampshire has sustained significant damages.  As a

result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

61.    Plaintiff, on behalf of Hampshire, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

62.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

63.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability of control and influence Hampshire, for which they are legally responsible.

64.    As a direct and proximate result of the Individual Defendants' abuse of control, Hampshire has sustained significant damages.

65.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

66.    Plaintiff, on behalf of Hampshire has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants
### for Gross Mismanagement

67.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

68.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

fiduciary duties with regard to prudently managing the assets and business of Hampshire in a manner consistent with the operations of a publicly held corporation.

69.    As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hampshire has sustained significant damages in excess of millions of dollars.

70.    Plaintiff, on behalf on Hampshire, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against the Individual Defendants
### for Waste of Corporate Assets

71.    Plaintiff incorporates by references and realleges each and every allegation set forth above as if set forth fully herein.

72.    As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Hampshire to waste valuable corporate assets and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

73.    As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

74.    Plaintiff, on behalf of Hampshire, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Defendants
### for Unjust Enrichment

75.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

31

76.    By his wrongful acts and omission, the Individual Director Defendant was unjustly enriched at the expense of and to the detriment of Hampshire.

77.    Plaintiff, as shareholder and representative of Hampshire, seeks restitution from the Individual Defendant, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendant, from his wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Against the Individual and Director Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' or their other assets so as to ensure that Plaintiff has an effective remedy;

C.    Awarding to Hampshire restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

::ODMA\WORLDOX\F:\DOCS\999180\JH0202.DOC

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

/s/ Mike Kelly

Mike Kelly
500 Taylor Street, 4th Floor
Columbia, South Carolina 29201
Phone:        (803) 726-0123
Fax:          (803) 252- 7145
mkelly@mklawgroup.com

-and-

William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Phone: (405) 235-1560
Fax:     (405) 239-2112
wfederman@aol.com

-and-

Marc Henzel
LAW OFFICES OF MARC HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Phone: (610) 660-8000
Fax:      (610) 660-8080
Mhenzel182@aol.com